IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JEFFREY D. LEISER,

    Plaintiff,

    v.

MARIO CANZIANI, et al.,

    Defendants.

OPINION and ORDER

Case No.  16-cv-860-slc

---

Pursuant to 42 U.S.C. § 1983, pro se plaintiff Jeffrey Leiser has brought First Amendment free speech and retaliation claims against employees of Stanley Correctional Institution (Stanley).  Leiser challenges a 2016 conduct report in which he was found guilty of receiving money in exchange for providing legal services to other prisoners.  Defendants have filed a motion for summary judgment.  (Dkt. 29.)  For the reasons set forth below, I am granting defendants' motion, and closing this case.

As an initial matter, Leiser seeks an order striking defendants' response to his proposed findings of fact, in which they label most of Leiser's proposed facts "immaterial." (Dkt. 44.) Leiser asks that the court deem these proposed facts to be undisputed.  It's six of one, half-dozen of the other:  many of Leiser's proposed facts *are* immaterial to his remaining claims in this lawsuit; therefore, it doesn't matter whether I deem them undisputed because it doesn't change anything.  For example, several of Leiser's proposed facts relate to his belief that the challenged conduct report violated his due process rights; these facts are immaterial because I did not allow Leiser to proceed on a due process claim.  (*See* Jan. 30, 2018, Order (dkt. 13) at 12-14.) Therefore, I have not included these facts in the court's findings of fact.  On the flip side, I have deemed undisputed and have included some of Leiser's proposed facts related to his other claims; for the most part, these are facts that the defendants did not dispute.

UNDISPUTED FACTS[1]

## I.    Parties

Leiser currently is incarcerated at the Redgranite Correctional Institution, but the events underlying his claims took place when he was incarcerated at Stanley Correctional Institution (Stanley).  Defendants, all Stanley employees, are Mario Canziani, the deputy warden; Patrick J. Lynch, a unit supervisor; and Bradley Lundmark, a supervising officer.

## II.   Investigation into Leiser's Activities and his TLU Placement

On March 16, 2016, Stanley mailroom staff member Michelle Moore, who is not a defendant in this lawsuit, completed an incident report concerning an outgoing letter found from a former Stanley prisoner, Robby Lillyblad, and addressed to non-prisoner Denise Gray.  (Def. Ex. 1000 (dkt. 32-2).)  Moore reported that, in the letter, Lillyblad asked Gray to send money to Leiser, whom Lillyblad had hired to do legal work.  Lillyblad wrote:

> Listen the reason why I'm writing you is to ask for your help. When I got here at Stanley I was looking into trying to get my case looked at by a lawyer but I could not really afford one being as I'm locked up with no source of income.  So I asked around and found out that one of the guys on my housing unit use[d] to be a lawyer before he got locked up.
>
> His name is Jeff and I was introduced to him by my buddy John Kuslits.  John told me that Jeff is a real good lawyer.  He told me that he's had Jeff doing legal work for him for a couple of years now and John told me the best way to pay Jeff for his legal work is to have a relative or someone I know on the outside either send Jeff a[n] order from a vendor we're allowed to order clothes and shoes from or I can have someone send Jeff a money order.

---

[1]  Unless otherwise noted, these facts are material and undisputed when viewed in a light most favorable to Leiser.  I have drawn these facts from the parties' proposed findings of facts and the cited evidence of record.

John said that he has his sister Ursula order Jeff clothes and shoes from vendors sometimes and other time[s] he has her send Jeff money orders using someone else's name. So that way the prison staff won't know what there [*sic*] doing.

\* \* \*

I told Jeff I can't pay him by getting him stuff from vendors, so I've been giving him canteen a little at a time to pay off the amount of money we agreed on as payment for his legal services. Which we agreed on $500 for his fee. So far I've gave [*sic*] him $100 in canteen. For that price he said he can get those past OWI's overturned. Which means I won't have them on my record and can have a fresh start.

What I need you to do for me is send Jeff $20 until I can get a job and get on my feet then I will send him the rest of what I owe him after I get my 1st check. That will leave me owing him $380.

Given my past track record of being irresponsible, I know you may be a little hesitant about helping me out with what I'm asking you, but please believe me when I tell you that I've checked everything out with this guy Jeff by asking around about him and everyone says he's on the up and up. Do you remember a guy named Dan Worzella who use to go to school with Brad? Well anyway he's in here and he's even got Jeff doing all his legal work for him. Dan told me he's paid Jeff a couple grand so far and he's happy with the work Jeff's done for him.

So I'd really appreciate it if you'd send out a $20 dollar money order to Jeff as soon as possible ok. . . . Till then take care and thanks for helping me out.

\* \* \*

Send the money order to Jeffrey Leiser #330229 Stanley Correctional Institution 100 Corrections Dr. Stanley, WI 54768[.]

P.S. – you might get this letter a little later after I've been released. I asked my buddy on the unit to drop it in the mail on the day I was releases so I hope he didn't forget to do it. He's an old guy.

(Def. Ex. 1000 (dkt. 32-1.)

Lynch was directed to investigate Lillyblad's statements about Leiser's for-pay legal assistance.

On March 25, 2016, Lynch ordered an officer to search Leiser's cell and remove all legal materials. When Leiser confronted Lynch and asked him why Lynch was taking away his legal materials, Lynch responded "because I can." When Leiser pressed him on the issue, Lynch refused to answer and sent Leiser to segregation in the temporary lockup unit (TLU).[2]

Lynch's investigation of Leiser included these steps: reviewing Leiser's mail; interviewing Leiser; reviewing Leiser's inmate account; reviewing visitor logs; and making notes of his findings. Among Leiser's personal legal documents, Lynch discovered other prisoners' legal documents related to pending litigation. In particular, Leiser had legal documents belonging to inmates Daniel Worzalla and Coleon Gallion, as well as a letter from Maurice Corbine asking for additional assistance with his legal matter, and a packet of letters about Gallion's legal defense sent to Leiser by a nonprisoner named Talisha Paige.

When Lynch reviewed Leiser's inmate account record, he found several payments from the families and friends of Leiser's fellow inmates: Leiser received a $100 payment from Worzalla's father on February 8, 2016, and payments of $175 and $150 from Talisha Paige,

---

[2] When Leiser was placed in TLU, he received a "Notice of Inmate Placed in Temporary Lockup" that Lynch signed on March 25, 2016. Leiser and defendants submitted slightly different versions of the notice. They are identical in all respects save one: defendants' version includes additional notes and a signature from Lundmark dated March 28, 2016. (*Compare* Def. Ex. 1003 (dkt. 32-4) *with* (Pl. Ex. 100-0011 (dkt. 39-11).) Leiser believes that Lundmark doctored defendants' notice, thus indicating that Lundmark was biased against him, a fact that arguably would be relevant to Leiser's retaliation claim.

But Lundmark avers that he reviewed Leiser's TLU placement on March 28 (Lundmark Decl. (dkt. #33) ¶ 10). The logical inference is that there are two versions of the notice: one that Leiser received on March 25 and submitted to the court, and the other that Lundmark reviewed and marked up three days later. There is no evidence beyond Leiser's speculation that the defendants have submitted a falsified document. This does not create a genuine issue of fact on his claim that the document was intentionally doctored. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Accordingly, I have not considered Leiser's accusation of exhibit tampering (and concomitant animus) for purposes of resolving defendants' motion for summary judgment.

Leiser makes the same falsification accusation against defendants' Exhibit 1004. As just noted, Leiser's uncorroborated accusation does not cause me to find that defendants altered Exhibit 1004.

who visits Coleon Gallion.  Lynch interviewed Leiser, who acknowledged that he helped other inmates with their cases but insisted that he did not charge money.  Later, when Leiser was in TLU, he admitted to Lynch that he was working for Corbine and had received $20 from Denise Gray.  According to Leiser, he told Lynch that he received money from Paige and Gallion as gifts.

### III.    Conduct Report #2802798, Hearing, and Appeal

Based on the evidence he had gathered, Lynch concluded that he should write up Leiser for charging and accepting payments for assisting other inmates with their legal matters.  On April 7, 2016, Lynch issued Conduct Report #2802798, charging Leiser with enterprises and fraud, disobeying orders, and unauthorized transfer of property.  Lynch attached evidence supporting the charges to the conduct report.  (Def. Ex. 1002 (dkt. 32-3).)

On May 19, 2016, Lundmark held a hearing on the charges in Conduct Report #2802798.  (Def. Ex. 1002 (dkt. 32-3).)  The evidence in support of the charges included: Lynch's statements in the conduct report, the letter from Lillyblad to Gray, the incident report from the mailroom, an envelope containing the $20 money order from Gray to Leiser, and a letter from Corbine to Leiser.  (*Id.* at 13.)

Leiser contested the hearing, claiming that Lillyblad lied in the letter.  In support, Leiser submitted evidence and witnesses in support of his claim that the money he had received all had been gifts, not payment for legal services.  Leiser presented testimony from three witnesses: Inmates Worzalla and Gallion each testified that they never had paid Leiser for legal work. Gallion further testified that Paige's mother used to date Leiser, which explained why Paige would send Leiser money as a gift.  Correctional Officer Adrian testified that he had given Leiser

permission to possess other inmates' legal material in his cell. Leiser also sought to submit letters from Paige and Corbine corroborating his defense that he did not receive money for legal work, but Lundmark did not accept these letters into evidence.

Finally, Leiser testified on his own behalf. He stated that he did not charge for legal work, that Lillyblad was lying in the letter, and that Leiser had never even done legal work for Lillyblad. Leiser directed Lundmark to the Wisconsin Circuit Court Access website, pointing out that there was no public record of legal proceedings brought by Lillyblad. Leiser concluded by stating that he should not be punished for being friends with people who want to send him money, and that he had no idea that Worzalla's mom would send him money. (*Id.* at 11.)

Lundmark found Leiser guilty of violating § DOC 303.36(1)(A), Enterprises and Fraud, and § 303.40, Unauthorized Transfer of Property, but not guilty of violating § 303.28, Disobeying Orders. According to Lundmark, his view of the evidence, the facts and statements warranted a guilty finding on the enterprises and fraud charge because the evidence showed that Leiser was conducting legal work for inmates and receiving monetary payment into his account from the inmates' family and friends. Lundmark found Lynch's statements in the conduct report credible; Lynch had no reason to fabricate the information, making it was more likely than not that Leiser committed the acts outlined in the conduct report. Lundmark punished Leiser with 16 days of room confinement and loss of electronics. (*Id.* at 13.) That same day Lundmark signed a contraband form that authorized staff to dispose of (1) the envelope that contained the $20 money order, (2) Leiser's inmate account, (3) Lillyblad's letter, (4) the mailroom incident report, and (5) the letter from Corbine to Leiser. (*Id.* at 5.)

On May 22, 2016, Leiser appealed Lundmark's decision to Warden Richardson, claiming that Lynch had violated Leiser's due process rights by not giving notice of the property he had seized and by failing to inform Leiser why he was being placed on TLU. Leiser further argued that Lillyblad's letter was uncorroborated by any other evidence at the hearing, and that no other evidence at the hearing supported the conclusion that Leiser was being paid for giving other inmates legal advice. On May 31, 2016, Canziani denied Leiser's appeal, finding that there were no procedural errors and that Leiser's version of events did not negate the evidence supporting the guilty finding. In particular, Canziani noted that Adrian's testimony was not specific. (Ex. 106, dkt. 1-8.)[3]

## IV.   Leiser's Retaliation Evidence

Leiser claims that Lynch, Lundmark, and Canziani each wanted to punish him for his activities as a jailhouse lawyer and for filing his own grievances and lawsuits. As for Lynch's charges in the conduct report, Leiser avers that Lillyblad lied in his letter; in fact, says Leiser, he does not even know Lillyblad. Leiser further avers that even though he received $20 in the mail from Gray, he does not know her and he tried, unsuccessfully, to refuse the money. Leiser further avers that all three defendants knew that he was a jailhouse lawyer and that he had sued other Stanley employees, including Lynch, in other lawsuits in this court. Indeed, in *Leiser v. Kloth*, Case No. 15-cv-768, Leiser is proceeding on a claim against a former correctional officer

---

[3] Later in 2016, Leiser was transferred out of Stanley. Leiser believes that this transfer was punishment for helping other inmates with their criminal cases. While Leiser has submitted several proposed findings of fact related to the transfer decision (*see* PPFOF (dkt. 38) ¶¶ 45-46), I denied Leiser leave to proceed on any claim related to his transfer. Accordingly, and as explained above, those proposed facts are immaterial to his claims in this lawsuit and have been excluded from consideration for purposes of defendants' motion for summary judgment.

at Stanley, and in *Leiser v. Hannula*, Case No. 15-cv-328, Leiser named Lynch as a defendant (although Lynch was dismissed at the screening stage).

As for Lundmark, Leiser supports his belief that Lundmark knew about Leiser's legal activities by citing to a May 24, 2016, email. That email appears to be a summary of inmates who were up for transfer consideration. The person writing the email refers to one of the inmates as being similar to Leiser, referring to that inmate as a "legal beagle." (Pl. Ex. 100-31 (dkt. 39-21).) Finally, Leiser claims that Canziani knew about his lawsuits because of an email he received from Stanley unit supervisor Paula Stoudt, who wrote Canziani an email on April 5, 2016, explaining that Lynch was investigating Leiser and referring to Leiser's "litigious nature" and the fact that Stoudt was already involved in a Leiser lawsuit. (Pl. Ex. 100-27 (dkt. 39-27).)

OPINION

Leiser is proceeding in this lawsuit on First Amendment free speech and retaliation claims against Canziani, Lundmark, and Lynch. Specifically, I granted Leiser leave to proceed on a free speech claim because he alleged that defendants confiscated his legal materials and stopped him from engaging in authorized communications with other inmates about their legal issues. Leiser's retaliation claim is slightly different: I allowed him to proceed against Lynch because Lynch allegedly punished Leiser for filing other lawsuits and acting as a jailhouse lawyer. I allowed him to proceed against Canziani and Lundmark for punishing him for his jailhouse

lawyer activities alone. Defendants seek judgment in their favor on all claims.[4]

## I.    Free Speech

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court determined prison officials may restrict a prisoner's First Amendment right to free speech if the restriction is "reasonably related to legitimate penological interests." *Id.* at 87. To analyze whether a restriction is reasonably related to legitimate penological interests, the Supreme Court set out four factors: (1) the existence of a "valid, rational connection" between the regulation and a legitimate, neutral government interest; (2) the existence of alternative methods for the inmate to exercise his constitutional right; (3) the effect the inmate's assertion of that right will have on the operation of the prison; and (4) the absence of an obvious, easy alternative method to satisfy the government's legitimate interest. *Id.* at 89-91. Once defendants make a showing as to the first factor, the burden shifts to the plaintiff to adduce evidence with respect to the other three elements. *Singer v. Raemisch*, 593 F.3d 529, 536-37 (7th Cir. 2010) ("[T]he burden shift[s] to the prisoner once the prison officials provide the court with a plausible explanation."); *Jackson*

---

[4] Defendants don't see much difference between Leiser's First Amendment free speech and retaliation claims. As to Leiser's claims against Canziani and Lundmark, defendants have a point: because Leiser was allowed to proceed on a theory that Canziani and Lundmark were punishing him for lawful communications with other prisoners, Leiser's retaliation claim rises or falls under the first element of the retaliation standard, which requires Leiser to show that his activity was constitutionally protected. However, now on a more developed record, Leiser *also* argues that Canziani and Lundmark were retaliating against him for his other lawsuits.

Leiser's claim against Lynch is different: he asserts that Lynch retaliated against him not just for acting as a jailhouse lawyer, but also for filing another lawsuit. Given that Leiser's other lawsuits are undisputably constitutionally protected activity, this retaliation claim requires analysis of all of the elements. Accordingly, while I agree with defendants that there is some overlap, the two claims remain distinct and I am analyzing them separately.

*v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007) ("When challenging the reasonableness of the prison's regulation, the inmate bears the burden of persuasion.").

In resolving a *Turner* question, this court "must afford substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *Koutnik v. Brown*, 456 F.3d 777, 785 (7th 2006) (quoting *Beard v. Banks*, 548 U.S. 521, 530 (2006)); *Watkins v. Kasper*, 599 F.3d 791, 797 (7th Cir. 2010) (a prisoner maintains a "general First Amendment right to criticize [prison] policies," but "he must do so in a manner consistent with his status as a prisoner").

Leiser does not dispute that the defendants have a legitimate interest in ensuring that prisoners do not engage in the practice of law for compensation, since this is illegal, *see* Wis. Stat. § 757.30(2), and a violation of DOC policy, *see* Wis. Admin. Code § 303.36(1)(a). *See also Gometz v. Henman*, 807 F.2d 113, 115 (7th Cir. 1986) (prisoners may not lawfully charge for legal services); *Green v. Walker*, 398 F. App'x 166, 168-69 (7th Cir. 2010) (inmates have no right to "retain legal documents belonging to others"). Instead, Leiser insists that defendants got it wrong: the money he received from Paige and Gallion were gifts, and he completely disavows any relationship with Gray.

Whether defendants' challenged decisions were correct is not the question that this court needs to answer. The operative question is subtler: did the defendants' decisions bear a logical relationship to a legitimate penological interest? Honing in more tightly this question becomes: looking at all of the information available to the defendants at the time, were the defendants

"rational in their belief that" Leiser was accepting money for his legal services? *Singer*, 593 F.3d at 536. To answer this question for each defendant, I will consider the evidence known to that defendant when he decided to punish Leiser for accepting money in exchange for legal services.

When Lynch investigated Leiser's property and accounts, he learned that Leiser possessed legal documents belonging to Worzalla and Gallion, and that Leiser recently had received payments from Worzalla's father and from Paige, one of Gallion's visitors. Lynch also uncovered a letter from Corbine indicating that Leiser was doing legal work for him. Leiser admitted to Lynch that Gray had sent him the $20 that Lillyblad had asked her to send in the elucidative letter quoted at length above.

Notwithstanding Leiser's self-exculpating explanations for these payments, Lynch had information that permitted him rationally to infer that Leiser was violating prison policy and Wisconsin law by accepting money for legal services. Leiser vehemently denied that he received money for providing legal services, but that's not enough by itself to keep Lynch on the hook. Leiser has not submitted any evidence showing that there was no objectively reasonable basis for Lynch to reach this conclusion, or that Lynch did not actually believe that Leiser was performing legal work for hire. On this record, Lynch's decision to write the conduct report bore a logical connection to the institution's legitimate interest in ensuring that prisoners were not receiving money for legal services.

Thereafter, Leiser developed and submitted a great deal of exculpatory evidence for Lundmark to consider at the May 19, 20-16 conduct report hearing: Leiser's statements; Worzalla and Gallion's testimony that Leiser was not paid for legal services; CO Adrian's testimony that he had authorized Leiser to possess other inmates' legal materials; and the fact

that Lillyblad had not made any publicly available filings in the Wisconsin circuit court system. Going in the other direction were Lynch's statements in the conduct report; evidence that Leiser had received $20 from Gray; Lillyblad's letter; the incident report from the mailroom; and the letter from Corbine to Leiser.

It was Lundmark's prerogative as the hearing officer to weigh the evidence and make credibility determinations. It is not this court's prerogative to reweigh the evidence or second-guess Lundmark's decision. This court's job is to determine whether it was rational for Lundmark to reach the conclusion that Leiser challenges in this lawsuit. Put another way, it is irrelevant that Lundmark *could* have ruled in Leiser's favor if it was objectively reasonable for him to rule against Leiser based on the evidence that Lundmark had before him at the hearing.

I conclude that Lundmark was in a position to reasonably infer that the payment Leiser received from associates of Worzalla and Gallion were linked to the legal work that Leiser was performing for them. It follows from this that Lundmark also could reasonably conclude that Gray's $20 payment was prompted by Lillyblad's request that she help him pay for Leiser's legal work, despite Leiser's disavowal of both Lillyblad and Gray. While Leiser disagrees with Lundmark's conclusions, Leiser has not submitted any evidence suggesting that Lundmark actually knew that Leiser's version of events was true yet ruled against Leiser anyway. This court defers to Lundmark's view of the evidence and has no basis under *Turner* to second-guess his conclusion. *See, e.g., Beamon v. Pollard*, No. 15-cv-560, 2017 WL 401218 at *8 (E.D. Wis. Jan. 30, 2017); *Singh v. Gegare*, No. 14-cv-837, 2015 WL 7430027 at *8 (E.D. Wis. Nov. 20, 2015) (court will not second guess hearing officer's credibility determinations or findings).

Finally, when Canziani reviewed Leiser's appeal, Leiser again asserted that the money he received was not for legal services, that his due process rights had been violated, and that the information in Lillyblad's letter was not corroborated by the other evidence that Lundmark had considered at the hearing. Canziani rejected Leiser's arguments and affirmed Lundmark's decision. This affirmance was grounded in facts. Canziani also made a fair observation regarding Officer Adrian's testimony by noting that Adrian had not provide any detail about *when* he had authorized Leiser to possess other prisoners' legal materials. On this record, therefore, I find that defendants' decisions to confiscate Leiser's legal materials and punish him for taking money for conducting legal services bore a rational relationship to legitimate penological interests.

Leiser insists that Lillyblad's letter was false, and none of the evidence supporting Lundmark's findings corroborated the information in the letter. Leiser points out that: Lillyblad did not actually appear at the hearing and argues that his letter should not have been trusted; Lynch did not recover any of Lillyblad's legal materials from Leiser's possession; Lillyblad's CCAP record did not include any open matters; and, defendants never referred Leiser's activities to the Attorney General's office for prosecution. This does not suffice to undermine the reasonableness of Lynch's investigation and Lundmark's ultimate conclusions.

For one, Lillyblad did not have to be pursuing a lawsuit in Wisconsin state court, nor did Leiser actually have to possess Lillyblad's legal materials for Leiser to be doing legal work for Lillyblad. In any event, as laid out above, Lynch had multiple other data points that corroborated his belief that the $20 Leiser received was for legal services he provided Lillyblad.

Next, Leiser challenges defendants' failure to call Lillyblad as a witness at the conduct report hearing, and he categorizes Lillyblad's letter as inadmissible hearsay. But the use of hearsay evidence during a prison disciplinary hearing does not violate due process. *Vega v. Morgan*, No. 16-cv-573-jdp, 2018 WL 1318916 at *4 (W.D. Wis. 2018), *citing Jackson v. Carlson*, 707 F.2d 943, 948 (7th Cir. 1983). Therefore, it was Lundmark's prerogative whether to admit the letter and to determine how much weight to give it, which puts the lie to Leiser's contention that there needed to be *direct* proof that he received money in exchange for legal service for Lundmark to find him guilty. Certainly the content of Lillyblad's letter was relevant to Lundmark's determination whether Leiser was performing legal services for pay, a practice that the institution had a legitimate reason to prohibit.

Leiser's remaining arguments simply challenge defendants' failure to require direct, undisputed proof that he accepted money for legal services. As noted above, this argument is a nonstarter.

Apart from this, Leiser has failed to show that the remaining three *Turner* factors weigh in his favor. First, as to whether there are alternative means for Leiser to exercise his right, Leiser argues that there really is no alternative to permitting him to act as a jailhouse lawyer because other prisoners need him to access the courts. But the defendants did not write up and punish Leiser for acting as a jailhouse lawyer; they wrote him up and punished him for accepting pay for his services. Leiser has not presented any evidence suggesting that he is unable to continue helping other inmates for free, and defendants point out that nothing in the record suggests that Leiser has ever been precluded from doing so. This factor is neutral at best.

14

Next, Leiser claims that his ability to exercise the right has no effect on the operation of the prison. Again, this claim ignores the elephant in the corner: providing free legal services to fellow inmates apparently does not concern the institution, but permitting jailhouse lawyering for pay is fraught with institutional perils attendant to any prohibited payment for services between inmates. *See Shaw v. Murphy*, 532 U.S. 223, 231 (2001) (inmate law clerks sometimes are a menace to prison discipline, and prisoners have an acknowledged propensity to abuse both the giving and seeking of legal assistance); *cf. United States v. Bogan*, 267 F.3d 614, 622 (7th Cir. 2001) (due to their contraband value to inmates, "the mere confiscation of a small quantity of sugar and a few postage stamps would serve to provoke a violent assault" on a correctional officer). To the extent any further discussion is needed regarding Leiser's demand for a higher burden of proof, such a requirement would greatly increase the time and effort required to investigate and prove violations, an additional expenditure of resources the Wisconsin DOC can ill afford.

Finally, as to whether there were obvious alternative restrictions that would address the State's concerns, Leiser proposes that the DOC require prison staff to submit direct proof of the violation rather than a "fabricated letter." This suggestion, which actually is more of an argument, fails to recognize that courts must afford prison officials the discretion they need to ensure the legitimate interests of the institution. Evidentiary weight and credibility determinations belong to the institution.

In sum, the evidence of record establishes that the conduct report and punishment bore a logical connection to defendants' legitimate interest in preventing prisoners from receiving money for legal services, and Leiser has not begun to show that the remaining three *Turner*

15

factors favor him. Accordingly, Leiser's First Amendment free speech claims fail as a matter of law, and I am granting defendants' motion for summary judgment as to these claims.

## II.      Retaliation

To succeed on a retaliation claim, Leiser must prove not only that he was engaging in activity protected by the Constitution (and thus passing muster under *Turner*), but also that the defendants' conduct was sufficiently adverse to deter a person of "ordinary firmness" from engaging in the protected activity in the future, and the defendant subjected the plaintiff to adverse treatment because of the plaintiff's constitutionally protected activity. *Gomez v. Randle*, 680 F.3d 859, 866-67 (7th Cir. 2012); *Bridges v. Gilbert*, 557 F.3d 541, 555-56 (7th Cir. 2009). With respect to the third prong, at the summary judgment stage the plaintiff must produce evidence supporting an inference that his speech was at least a motivating factor in the alleged retaliation; then, the burden shifts to the defendant to rebut the causal inference. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 965-66 (7th Cir. 2012).

Even though Leiser's claim that defendants violated his free speech rights fails as a matter of law, *arguendo* his retaliation claim might still have legs, since Leiser claims that defendants *also* retaliated against him for his prior lawsuits, which clearly are constitutionally protected. *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002). But the evidence of record does not support the conclusion that any of the defendants sought to punish Leiser for engaging in constitutionally protected activity. To the contrary, in the absence of any evidence that any of the defendants intended to punish Leiser for having filed other lawsuits, the only reasonable inference to be

drawn from the evidence is that Lynch, Lundmark, and Canziani each genuinely believed that Leiser was improperly receiving compensation for acting as a jailhouse lawyer.

Lynch was responsible for investigating whether Leiser was accepting money for legal services. Lynch learned that: Leiser possessed legal documents of Worzalla and Gallion; Leiser received $100 from Worzalla's father in February of 2016; Leiser received $175 and $150 from Paige, one of Gallion's visitors; and finally, that Leiser had, indeed, received the $20 from Gray. To be fair, Lynch also knew that Leiser claimed the money from Paige and Gallion were gifts, and Leiser completely disavowed Gray. Beyond Leiser's denials, however, there is no evidence suggesting that Lynch had reason to believe that those payments were actually gifts or that he actually knew or believed that Leiser did not know Gray. Based on this evidence alone, a reasonable fact finder could not conclude that Lynch's decision to write up the conduct report intended to punish Leiser for engaging in authorized activities.

Even if Lynch had possessed less evidence supporting his suspicion that Leiser was receiving money for legal services, Leiser has not come forward with any evidence, direct or indirect, that Lynch genuinely knew but ignored that Leiser received the money as a gift or, more saliently here, that Lynch otherwise intended to punish Leiser for having filed other lawsuits. Leiser simply contends that Lynch, as a defendant in one of Leiser's lawsuits, must have intended to retaliate against him. That's not enough. Logicians call this the post hoc fallacy; statisticians observe that correlation does not imply causation; the court of appeals says that facts require more than just speculation or conclusory statements. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). At this stage, Leiser is obliged submit more than speculation about Lynch's motivations Because he has not, Lynch is entitled to judgment on this claim. *See Siegel v. Shell*

*Oil Co.*, 612 F.3d 932, 937 (7ᵗʰ Cir. 2010) ("Summary judgment is the 'put up or shut up' moment in a lawsuit"). On these facts, a contrary result would mean that an inmate who had filed previous lawsuits thereafter could survive summary judgment and obtain a jury trial in any lawsuit that challenged as retaliatory a subsequent prison disciplinary proceeding simply because of the fact of his previous lawsuits. As a matter of law and a matter of fact, this is not enough.

Lundmark had additional exculpatory evidence before him at the hearing, but the record still does not support a finding that Lundmark found Leiser guilty in order to punish him for having engaged in protected activity. I already have listed the evidence in both directions that was before Lundmark. As noted above, Lundmark ultimately made a credibility determination against Leiser. This, standing alone, does not permit an inference of a retaliatory motive. *See Perotti v. Quinones*, 488 F. App'x 141, 146 (7ᵗʰ Cir. 2012) ("Falsifying a disciplinary charge, however, will not give rise to liability for unconstitutional retaliation unless the motive for the fabrication was to retaliate for the exercise of a constitutional right."). Indeed, as this court has noted, prison officials in Lundmark's position are "not required to believe the prisoner in every instance or face liability for violating the prisoner's constitutional rights." *Wilson v. Greetan*, 571 F. Supp. 2d 948, 955 (W.D. Wis. 2007) (citing *Riccardo v. Rausch*, 375 F.3d 521, 525 (7ᵗʰ Cir. 2004)).

Further, and similarly to Lynch, Leiser's evidence that Lundmark learned about his lawsuits does not permit an inference that Lundmark intended to punish Leiser for his previous lawsuits. Leiser points to a May 24, 2016, email that refers to Leiser and another inmate as "legal beagles," but that email is dated *after* the May 19, 2016, hearing. Even assuming that Lundmark knew that Leiser had filed other lawsuits at the time of the hearing, no evidence

18

suggests that Lundmark found Leiser guilty *because* he had sued other Stanley employees. Again, Leiser has not submitted any evidence suggesting such a motivation, and the evidence of record suggests that Lundmark had sufficient evidence to conclude that Leiser was, indeed, violating prison policy by accepting money for legal services. Accordingly, no reasonable trier of fact could find that Lundmark intended to punish him for engaging in protected activity.

Leiser's challenge to Canziani's resolution of the appeal requires the same outcome. Leiser argued in that appeal that Lillyblad's letter was uncorroborated, and insists that his activities were authorized. Nonetheless Canziani affirmed the disposition because CO Adrian's testimony was not specific enough to exonerate Leiser and, in any event, there *was* sufficient evidence to support the finding against Leiser. As with Lynch and Lundmark, even if this court assumes that Canziani knew about Leiser's other lawsuits at that time, there is no evidence that Canziani knew that the money Leiser received was a gift, nor is there any evidence that Canziani wanted to punish Leiser because of his other lawsuits. Accordingly, no reasonable fact finder could conclude on this that any of the three defendants punished Leiser because of his legitimate activities as a jailhouse lawyer or his previous lawsuits.

III.    **Qualified Immunity**

As a backup argument, defendants claim that they are entitled to qualified immunity. *See* Brief in Support, dkt. 30, at 12-14. They contend that Leiser had no clearly established right to act as a jailhouse lawyer, with or without recompense; therefore, the defendants cannot be liable for interfering with that right. It follows, say the defendants, that they cannot be liable for retaliation based on Leiser's legal assistance to other inmates. (Defendants do not assert

qualified immunity against Leiser's claim that defendants retaliated against him for having filed his own lawsuits).

Qualified immunity protects government employees from liability for civil damages for actions taken within the scope of their employment unless their conduct violates "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quotations and citations omitted). While a plaintiff is not required to cite "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017) (internal quotations omitted).

Indeed, the Supreme Court recently reemphasized that "the clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (reversing and remanding finding that an officer was not entitled to qualified immunity because the lower courts had defined the "clearly established right" more broadly than the circumstances warranted). The "clearly established standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589, 2018 WL 491521, at *10 (2018) (internal citations omitted).

In short, qualified immunity "give[s] government officials breathing room to make reasonable but mistaken judgment about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once the defendant raises it. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017).

Leiser acknowledges that he has no clearly established right to act as a jailhouse lawyer. In fact, the case law clearly establishes that he does *not*. *See Shaw v. Murphy*, 532 U.S. at 231-32; *Beese v. Todd*, 35 Appx. 241, 244 (7th Cir. 2002). Leiser nevertheless claims that his right to assist other inmates with legal matters was clearly established, but the decisions he cites merely acknowledge the *possibility* that a free speech claim might exist. *See Harris v. Walls*, 604 F. App'x 518, 521 (7th Cir. 2015) ("a prisoner may also help another inmate, otherwise unable to help himself, access to the courts.") (citing *Johnson v. Avery*, 393 U.S. 483, 487 (1969)). Leiser has not cited any decision in which a court held that a conduct report and punishment violated a prisoner's First Amendment rights where prison staff had evidence that the prisoner was improperly taking money for legal services. Accordingly, Leiser has not shown that defendants violated a clearly established free speech right.

In support of his retaliation claim, Leiser cites to *Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996), in which the Seventh Circuit noted that a prisoner may assert a retaliation claim if transferred for assisting others with legal matters. In *Higgason,* the court viewed the reason for the prisoner's transfer as a swearing contest that was not susceptible to summary judgment; it also seems there was evidence that the defendants had transferred other jailhouse lawyers. *Id.,* n.3. *Higgason* does not clearly establish that Leiser had a First Amendment right to assist other inmates with their legal matters, particularly in the face of the case law cited in the previous

paragraph. Therefore, the defendants are entitled to qualified immunity on this aspect of Leiser's retaliation claim.

To the extent that Leiser is claiming that the defendants' motive for finding him guilty of accepting money for providing legal services actually was to punish him for filing his own lawsuits, Leiser's personal right of access to the courts is sufficiently well established that the defendants are not entitled to qualified immunity on this aspect of his retaliation claim. But they don't need it. As discussed above, Leiser's claim of retaliation has no evidentiary support.

ORDER

IT IS ORDERED that:

1.    Plaintiff Jeffrey Leiser's motion to strike (dkt. 44) is DENIED.

2.    Defendants' motion for summary judgment (dkt. 29) is GRANTED.

3.    The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 27th day of February, 2019.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge